**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**


**STEVEN H. BEASLEY,**

     **Plaintiff,**

**vs.**                         **Case No.  5:02cv129-MP/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

     **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. LOC. R. 72.2(D).  It is recommended that the decision of the Commissioner be affirmed.

**Procedural history**

This case has had a very lengthy procedural history.[1]  Plaintiff, Steven H. Beasley, applied for disability insurance benefits and supplemental security income benefits on December 16, 1994.  Doc. 118, p. 2.  *See also*, R. 18-19.  Plaintiff was

_____

[1] Plaintiff's recitation of the procedural history is adopted herein.

initially found to be disabled due to substance addiction disorder, and benefits were

granted.  *Id.*

In March, 1996, the Social Security Act was revised to prohibit award of benefits

if substance abuse is a contributing factor.  The law now provides that:

> An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.

42 U.S.C. S 423(d)(2)(C).[2]

---

[2] Untangling substance abuse from other impairments is not at issue in this case. However, the law governing this analysis is provided here in this footnote.  "[T]he claimant bears the burden of proving that his alcoholism or drug addiction is not a contributing factor material to his disability determination."  Doughty v. Apfel, 245 F.3d 1274, 1280 (11th Cir. 2001).  "The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol."  20 C.F.R. § 404.1535(b)(1).

> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

>> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

>> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 404.1535(b)(2).  "If the ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow."

As a consequence of this change of law, on January 1, 1997, Plaintiff's benefits were terminated.  Doc. 118, p. 2.  He requested an administrative hearing, and a hearing was held on May 26, 1999, resulting in an unfavorable decision.  *Id.*  The denial of reinstatement of his benefits was affirmed by the Appeals Council, and on March 27, 2002, Plaintiff filed suit in this court.  *Id.*, p. 3.  On September 18, 2002, on motion of Defendant, this court remanded pursuant to sentence six of 42 U.S.C. § 405(g), retaining jurisdiction.  *Id.* and doc. 16.  On remand, Defendant ordered further proceedings because Plaintiff's claim file could not be located.  *Id.*  The file eventually was located.  R. 18.

The further proceedings have taken over six years.  It is judicially noted from the Florida Department of Corrections internet site that Plaintiff was sentenced on June 24, 2004, to a prison term of 30 years for DUI manslaughter.[3]  Social Security benefits are not payable for any month during which a claimant is confined in a jail or prison for more than 30 days.  42 U.S.C. s 402(x)(1)(A)(i).  This, however, is only a suspension of benefit payments while incarcerated, and does not preclude judicial review of a denial of an application for a determination of disability for future benefits upon release.  Brue v. Heckler, 709 F.2d 937, 938-39 (5th Cir.1983).  Apparently Plaintiff seeks a dependent's payment to his daughter, although such a payment may be small.  R. 1720-1721.  He

---

Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003).  "A finding of disability is, in effect, a 'condition precedent' to applying the special rule on alcoholism and drug addiction."  *Id.*, citing 20 C.F.R. § 404.1535 and Frank S. Bloch, BLOCH ON SOCIAL SECURITY § 3.39 (2003).

[3] The website is:  http://www.dc.state.fl.us/ActiveInmates/search.asp

also seeks disability payments for the period January 1, 1997 to about June 24, 2004, the years during which he was not incarcerated.  R. 1723.

A second administrative hearing was held on October 12, 2004.  Doc. 118, p. 3. After an unfavorable decision, the Appeals Council remanded for a supplemental hearing.  *Id*.  The third administrative hearing took place on August 7, 2007.  *Id*., p. 4 and R. 1713-1775.  Petitioner was not represented by an attorney during any of these proceedings.  R. 19.  Another unfavorable decision by the Administrative Law Judge was rendered on October 25, 2007.  R. 18-33.  This last decision is now before this court for review.  Petitioner is now represented by counsel.

**The administrative decision before the court for review**

Plaintiff was born on July 14, 1963, was 44 years old at the time of the last administrative hearing (on August 7, 2007), has a 10th grade education with a 12th grade equivalency diploma, and has past relevant work as a maintenance worker in a refrigeration plant, a dental equipment repairman, and a stone mason.  R. 31, 1725-1726.  Plaintiff alleges disability due to alcohol and polysubstance abuse, anxiety disorder, gastroesophageal reflux disease, and degenerative disc disease of the cervical and lumbar spine.  It is uncontested that Plaintiff must show disability occurring on or before December 31, 2000, to be entitled to payment of disability insurance benefits.  R. 19.

The Administrative Law Judge adopted the summary of the medical evidence in her decision of February 17, 2005, as neither party had pointed to any errors in that summary.  R. 22.  The ALJ found at step 2 that Plaintiff has the following severe impairments:  history of alcohol and polysubstance abuse, anxiety disorder,

gastroesophageal reflux disease, and degenerative disc disease of the cervical and lumbar spine.  R. 21-22.  She concluded at step 3 that none of these, either singly or in combination, met or equaled a Listed impairment.  R. 23.  She found that Plaintiff has the residual functional capacity to perform unskilled light work.  R. 24.  She found that Plaintiff can no longer do his past relevant work.  R. 31.  At step 5, considering Plaintiff's age, education, work experience, and residual functional capacity, and relying upon Medical-Vocational Rule 202.21, the "grids,"[4] she determined that Plaintiff is not disabled as defined by Social Security law.  R. 32.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211

---

[4] Appendix 2 to Subpart P of Part 404 – Medical-Vocational Guidelines, found at: http://www.ssa.gov/OP_Home/cfr20/404/404-ap11.htm

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.    Does the individual have any severe impairments that meet or
      equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.    Does the individual have any impairments which prevent past
      relevant work?

5.    Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the Administrative Hearing**[5]

Plaintiff testified at the administrative hearing held on August 7, 2007, that he

worked as a stone mason, laying stone.  R. 1727.  He had no earnings between 1994 to

1999.  *Id.*  In 2000, he worked on the structural part of refrigeration plants, earning

---

[5] Descriptions of the purpose and effects of prescribed drugs are from PDRhealth™,
PHYSICIANS DESKTOP REFERENCE, found at
http://www.pdrhealth.com/drugs/drugs-index.aspx.  Information about medical terms
comes from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:
http://www.mercksource.com (Medical Dictionary link).

$11,000 in that year.  R. 1728, 1721-1722.  He also worked as an electrical repairman for equipment in a dental office.  R. 1729.

Plaintiff testified that he suffered a broken leg in 1999 and had surgery.  R. 1730. He said he was still having a lot of pain with that leg.  R. 1731.  He was given 800 milligrams of ibuprofen for this pain in prison.  *Id.*  He said that the work he had been given in prison includes handing out recreational equipment for about one to two hours three days a week, and he had to stand mostly on his right leg to do this work.  *Id.*  He said that his left leg is a lot weaker.  *Id.* and R. 1732.  He is allowed to alternate between standing and sitting in this job.  R. 1732.

Plaintiff said that he experienced neck pain if he sat for very long.  R. 1733.  He thought that he had injured his back in a motorcycle accident when he was 16 years old. *Id.*  He also had an automobile accident in 1999 that injured his neck.  R. 1734.  He said that at times his lower back hurts so bad it is hard to go to the bathroom.  *Id.*  Plaintiff said that when he sat, he becomes stiff, his feet become numb, and he has muscle spasms.  *Id.*  The pain he described as being worse in his right leg.  *Id.*

Plaintiff said that his reflux indigestion and hiatal hernia were currently causing him problems with sleep.  R. 1735.  He takes Zantac[6] for that.  He related this to the kind of prison food that he was served, stating that when he was not in prison, he ate "a real clean diet."  R. 1736-1737.

---

[6] Zantac is used to decrease the production of stomach acid, which may reduce irritation to the stomach lining and help heal ulcers and other gastrointestinal conditions. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Plaintiff said he was having a lot of trouble with his right heel.  R. 1738.  He implied that this made walking difficult.  *Id.*  He said his walking now is limited to 10 minutes at a time due to leg problems.  R. 1739.  He said that he has problems lifting 20 pounds, and thought that he would have a problem if he had to lift 20 pounds all day.  R. 1739.

Plaintiff said that he went to Life Management in 2002 for treatment of depression, and that he preferred at that time not to be around people.  R. 1741.  He said he has always had to deal with depression, "as far back as I can remember."  *Id.* He said that he had severe panic attacks.  R. 1742.  He said he had been diagnosed with OCD (obsessive compulsive disorder) and he attributed his panic attacks to this disorder, experiencing competitive [sic, repetitive] thoughts and compulsively checking things over and over.  *Id.*  Plaintiff said that when he has a panic attack, he suffers severe chest pains, breaks out in red splotches and sweat, and becomes extremely nervous.  *Id.*  He said he received medication that helped with the panic attacks, but this made his depression worse.  *Id.*   He was then taking Remeron.[7]  *Id.*  He had also taken Xanax.[8]  He said that Remeron helped him to rest.  R. 1743.

---

[7] Remeron is prescribed for the treatment of major depression – that is, a continuous depressed mood that interferes with everyday life. Remeron is thought to work by adjusting the balance of the brain's natural chemical messengers, especially norepinephrine and serotonin. It belongs to the class of drugs known as tetracyclics and is chemically unrelated to other antidepressants such as serotonin reuptake inhibitors and MAO inhibitors.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[8] Xanax is a tranquilizer used in the short-term relief of symptoms of anxiety or the treatment of anxiety disorders.  Anxiety disorder is marked by unrealistic worry or excessive fears and concerns.  Anxiety associated with depression is also responsive to Xanax.  Xanax and the extended-release formulation, Xanax XR, are also used in the treatment of panic disorder, which appears as unexpected panic attacks and may be

Later in his testimony, Plaintiff said that he can have four or five panic attacks in one day, or four or five in one week, or he can have an attack lasting a day or four days. R. 1756.  He said that he frequently has panic attacks at night, while trying to sleep.  R. 1757.  He also said his sleep is disrupted by acid reflux events and pain.  *Id.*  He said that when he has a panic attack, he tries to lie down and breathe because breathing becomes difficult and painful.  R. 1758.

Plaintiff testified that he has had problems all his life keeping a job due to panic attacks.  R. 1744.  He said this caused him to be unable to focus upon the jobs.  *Id.*

Plaintiff said that when he was working for one employer ("Horn"), he did not use drugs or alcohol.  R. 1746.  He said that most of his drinking was in the period prior to 1997.  *Id.*  He said he went for periods of six months or a year, and then up to two years, without drinking.  *Id.*  He said that his abuse of alcohol occurred at a younger age.  *Id.*  After 1997, his abuse of alcohol was more sporadic, but he said that his drinking caused trouble about once a month.  R. 1747.  He said he had not been drinking "fairly regularly" when he committed the DUI offense.  *Id.*  After 2001, he said he was able to control his cravings for alcohol through diet.  R. 1747-1748.

Defendant said that he had prior DUI convictions.  R. 1748.  He also asserted that although he was convicted and sentenced to 30 years for the DUI manslaughter, he was not the driver of the motor vehicle.  R. 1749.

Plaintiff said that due to acid reflux disease, pain in his neck, shoulder, and leg, and the panic attacks, he has difficulty sleeping well at night.  R. 1750.

_____

accompanied by a fear of open or public places called agoraphobia.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Plaintiff said that Dr. Reed had scheduled surgery for his neck pain, but the surgery was cancelled because Plaintiff "wasn't stable mentally."  R. 1752.

Plaintiff said that he did not have a lot of friends when he was living outside prison.  R. 1759.  He preferred to live by himself in a structured life.  *Id.*  Plaintiff testified that he was not married, but he had a daughter 16 years old.  *Id.*  His daughter visits him in prison.  *Id.*  His daughter lives with her mother in Texas.  R. 1753.

A vocational expert testified as to the residual functional capacity and skills to do Plaintiff's past relevant work.  R. 1764-1767.  The expert said that regularly missing more than two days per month for sickness would "be a problem" since sick leave usually accrues at only one day per month.  R. 1769.

The Administrative Law Judge then addressed Plaintiff.  R. 1755.  She explained to him that in her opinion, since Plaintiff was then a younger person (age 44), his physical limitations would not preclude a desk job.  R. 1755-1756.  She explained that therefore the real issue was whether Plaintiff's mental impairments would rule out an ability to do a desk job.  R. 1755.  She explained that disability benefits could not be awarded if alcohol abuse was Plaintiff's primary problem.  R. 1756.

**Legal Analysis**

### Whether the ALJ erred by not posing a complete hypothetical to the vocational expert

It is undisputed that the ALJ did not ask the vocational expert whether a hypothetical person like Plaintiff, with certain limitations supported by substantial evidence in the record, could find work in the national economy.  Instead, the ALJ used the "grids" at step 5.  Plaintiff contends that this was error.

The law governing use of the "grids" is the following:

> The general rule is that after determining the claimant's RFC and ability or inability to return to past relevant work, the ALJ may use the grids to determine whether other jobs exist in the national economy that a claimant is able to perform.  However, "[e]xclusive reliance on the grids is not appropriate either when [the] claimant is unable to perform a full range of work at a given residual functional level or when a claimant has non-exertional impairments that significantly limit basic work skills."

Phillips v. Barnhart, 357 F.3d 1232, 1142 (11th Cir. 2004) (emphasis added) (citations omitted).  "It is only when the claimant can clearly do *unlimited* types of light work, . . . that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy."  Allen v. Sullivan, 880 F.2d 1200, 1201-1202 (11th Cir. 1989) (citation omitted) (emphasis added).

The ALJ here determined that Plaintiff could do unlimited types of light work. Since, as will be discussed ahead, this conclusion correctly followed the law and is supported by substantial evidence in the record, there was no need to pose a hypothetical to the vocational expert.  It was proper to rely upon the "grids."

**Whether the ALJ erred by failing to articulate specific jobs that Plaintiff can perform**

Plaintiff argues that the ALJ erred by not describing specific jobs which Plaintiff could perform, given his residual functional capacity.  The ALJ, however, did not need to identify specific jobs.  The "grids" direct a finding that Plaintiff is not disabled based upon the understanding that many such jobs exist for a person, like Plaintiff, of his age, education, transferrable skills, and residual functional capacity.  That is the purpose of the "grids," to make testimony from a vocational expert unnecessary when a claimant can do a full range of work at his assigned residual functional capacity.

**Whether the ALJ erred by not finding  that Plaintiff's panic disorder
is a "severe" impairment at step 2**

The ALJ did not find that Plaintiff's "panic disorder" to be "severe" as that term is
understood at step 2.  As noted above, the ALJ did find that Plaintiff suffers from the
"severe" impairment of anxiety disorder.  R. 22.  Plaintiff contends that the ALJ erred by
not specify which type of anxiety disorder.  Doc. 118, p. 23, citing R. 22.  Plaintiff points
out that the National Institute of Mental Health lists five types of anxiety disorders, and
panic disorder is one: generalized anxiety disorder, obsessive compulsive disorder,
panic disorder, post-traumatic stress disorder, and social phobia (or social anxiety
disorder).  Doc. 118, p. 23, citing www.nimh.nih.gov.  Plaintiff argues, therefore, that
since the record is "replete with evidence of Steven Beasley's Panic Disorder, the Court
should remand this case" for all "severe" impairments to be considered.  Doc. 118, p.
25.

At step 2, the issue is whether Plaintiff has shown a condition which has more
than "a minimal effect on [his] ability to:  walk, stand, sit, lift, push, pull, reach, carry, or
handle, etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20
C.F.R. § 404.1521).  "In other words, the 'severity' of a medically ascertained disability
must be measured in terms of its effect upon ability to work, and not simply in terms of
deviation from purely medical standards of bodily perfection or normality."  McCruter v.
Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).  "[I]n order for an impairment to be
non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the
individual that it would not be expected to interfere with the individual's ability to work,
irrespective of age, education, or work experience.' "  Parker v. Bowen, 793 F.2d 1177,

1181 (11th Cir. 1986), *citing* Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984),

Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274.[9]

Plaintiff points out that he was diagnosed with panic disorder with agoraphobia

and generalized anxiety at the Life Management Center of Northwest Florida.  *Id.*, citing

R. 991.  On October 12, 2002, it was determined during an examination that Plaintiff

was friendly and cooperative, and that his anxiety was within normal limits.  R. 990.

Likewise, his appearance, the quality and content of his speech and thought,

perception, and sensorium were all within normal limits.  *Id.*  Plaintiff's mood was

depressed and sad, and his dominant character structure was depressive, and it was

noted that he had poor insight and judgment, however.  *Id.*  He was assigned a current

GAF of 60.[10]  Plaintiff then denied having full blown panic attacks, and he continued to

---

[9] "Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.  The claimant's burden at step two is mild."  McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying Brady).  A "severe impairment" is a "de minimis requirement which only screens out those applicants whose medical problems could 'not possibly' prevent them from working."  Stratton v. Bowen, 827 F.2d 1447, 1452 n. 9 (11th Cir. 1987), *quoting* Baeder v. Heckler, 768 F.2d 547, 551 (3d Cir. 1985).  It also has been characterized by the Supreme Court as a criterion which identifies "at an early stage those claimants whose medical impairments are so *slight* that it is unlikely they would be found to be disabled even if their age, education and experience were taken into consideration."  Stratton, 827 F.2d at 1452 n. 9 (emphasis by the court), *quoting* Bowen v. Yuckert, 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

[10] "The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.'  *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)."  Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).  Axis V of the DSM-IV Multiaxial System and the meaning of the GAF scores is explained at:  http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.  A GAF score of 51-60 indicates:  "Moderate symptoms ( e.g., flat affect and circumstantial speech, occasional panic attacks ) OR moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or co-workers)."

work out of town.  R. 991.  He was diagnosed with panic disorder, with agoraphobia, generalized anxiety, and alcohol abuse and dependence by history, with two years in remission.  *Id.*  These medical notes not substantial evidence in the record compelling a finding that Plaintiff's panic disorder was a "severe" impairment at step 2.

Plaintiff also notes that medical records from the Florida Department of Corrections show that he is currently treated for obsessive compulsive disorder, panic disorder, and alcohol abuse in remission.  Doc. 118, p. 23, citing R. 1103-1107.  Those records are the individualized service plan prepared by prison health care officials on August 3, 2004, at the Reception and Medical Center, when Plaintiff first entered the state prison system.  R. 1103-1107.  The plan shows diagnoses of obsessive compulsive disorder, panic disorder, and alcohol dependence in remission.  R. 1103.  The plan indicates that Plaintiff has had problems with anxiety and panic attacks since age 15, and currently experienced anxiety daily, all day.  R. 1105.  The plan also indicated that Plaintiff suffers from obsessions and preoccupations, interfering with concentration.  R. 1104.  The plan appears to be a synopsis of earlier medical findings, and not the results of an independent evaluation and examination on that date.  R. 1103-1107.  Still, this is some evidence that Plaintiff's anxiety and panic disorder might cause more than minimal restrictions upon his ability to work.

But the ALJ provided adequate reasons for not so concluding.  At step 2 of her analysis, the Administrative Law Judge noted that the medical records showed a

diagnosis of OCD (obsessive compulsive disorder) and Bell's palsy[11] (a malady not at

issue here).  R. 22.  She reasoned, however:

> Although OCD may be a component of an anxiety disorder, the
> Administrative Law Judge carefully reviewed the record and found no
> significant and continuing evidence of exacerbations or limitations
> emanating [from OCD or Bell's palsy], let alone any documentation that
> the claimant met the established diagnostic criteria for any consecutive 12
> month period.  Furthermore, the claimant did not describe how either OCD
> or Bell's palsy significantly limits his ability to perform basic work activities.

*Id.*  As a consequence,  at step 2 the ALJ did not include Plaintiff's anxiety disorder in

the list of "severe" impairments.  R. 21-22.

Error at step 2, however, does not necessarily result in reversal and remand by

this court.  Step 2 is important because an erroneous finding as to "severe" impairments

at step 2 may improperly foreclose a claimant's "ability to demonstrate the merits of her

claim for disability with respect to her former work activities."  Flynn, 768 F.2d at 1275.

Impairments must be evaluated in combination at all stages of the analysis.  20 C.F.R.

§§ 404.1523 and 416.923; Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990);

Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990); Davis v. Shalala, 985 F.2d 528,

534 (11th Cir. 1993).  Impairments must be evaluated in combination even though some

impairments are not severe.  Hudson v. Heckler, 755 F.2d 781, 785 and n. 2 (11th Cir.

1985).  The Eleventh Circuit has "repeatedly held that an ALJ must make specific and

---

[11] Bell palsy or Bell paralysis is neuropathy of the facial nerve, resulting in paralysis
of the muscles on one side of the face.  The person usually has sagging on one side of
the mouth, with drooling and lack of ability to whistle. . . .  This is often no more than a
temporary condition lasting a few days or weeks. Occasionally it may be the result of a
tumor pressing on the nerve or physical trauma to the nerve.  DORLAND'S ILLUSTRATED
MEDICAL DICTIONARY.

well-articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled."  Davis v. Shalala, 985 F.2d at 534.

In Flynn, the claimant had contended that she had "uncontrollable, severe hypertension."  768 F.2d at 1274.  Her treating physicians had found that she could not return to her former employment due to this condition.  *Id.* at 1275.  One physician had warned that should she return to her former work, she had "good reason to be fearful that her work will cause her blood pressure to elevate again and may possibly cause stroke or heart attacks."  *Id.*  The court reasoned that on this record, the decision that the claimant had not shown a "severe impairment" was not supported by substantial evidence in the record.  *Id.*  The court expressed concern that by making a finding of no severe impairment at step 2 of the analysis, the Commissioner had foreclosed the claimant's "ability to demonstrate the merits of her claim for disability with respect to her former work activities."  *Id.*

Flynn is distinguishable from the case at bar.  The Administrative Law Judge here thoroughly discussed and considered Plaintiff's "mental impairments" at step 3, R. 23-24, and in determining Plaintiff's residual functional capacity at steps 4 and 5.  R. 24-31.  Even if it were error to have failed to find Plaintiff's mental problems to have been "severe" at step 2, this did not result in a failure to consider those problems at the later stages of analysis.  As will be discussed ahead, her analysis at steps 4 and 5 followed the law and has the support of substantial evidence in the record.  Accordingly, this argument is unpersuasive.

**Whether the ALJ erred in the evaluation of Plaintiff's subjective testimony as to the extent of his disability from anxiety and pain**

Plaintiff's final claim is the most important one.  Plaintiff's testimony would result in a finding of a much more limited residual functional capacity had the ALJ fully credited it.  The most significant aspect of Plaintiff's testimony concerned his experience of anxiety and panic, though Plaintiff also described limitations caused by pain.

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for disregarding the claimant's subjective pain testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's pain standard if his findings "leave no doubt as to the appropriate result" under the law.  Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

"A claimant's subjective testimony supported by medical evidence that satisfies the pain standards is itself sufficient to support a finding of disability.  Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence."  Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations omitted).  "[W]here proof of a disability is based upon subjective evidence and a credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."  Id. at 1562, quoting, Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983).

Plaintiff's arguments for a determination that the ALJ erred in the evaluation of Plaintiff's subjective testimony fail to cite or discuss evidence in the record to show that the ALJ's conclusion either does not follow the legal standard, or lacks the support of substantial evidence in the record.  Doc. 118, pp. 25-29.  Plaintiff spends much of this section of the memorandum reciting the law.  Plaintiff notes that degenerative disc disease is known to produce pain, and the National Institute of Mental Health describes the symptoms and consequences of panic disorder, but those medical descriptions are not evidence of the severity in fact of Plaintiff's condition.  R. 27-28.  Plaintiff did provide a synopsis of the medical evidence and Plaintiff's testimony, R. 4-21, but does not relate this summary to the specifics of the ALJ's decision.  The arguments as to this issue, therefore, are insufficient.

Nonetheless, the following analysis of the ALJ's decision compared to the record is made.  At step 3, the ALJ determined that Plaintiff's mental impairments do not meet or equal a listed impairment.  R. 23-24.  Plaintiff does not contest this step 3 conclusion.

Plaintiff's implicit challenge is to the step 5 conclusion and the use of the "grids."  In determining at steps 4 and 5 that Plaintiff could do an unlimited range of light work, the ALJ thoroughly discussed the evidence concerning Plaintiff's anxiety disorder and back pain.

**Pain**

With respect to back and leg pain, the ALJ found that no treating source had ever advised Plaintiff not to work.  R. 24.  She said that Plaintiff had been advised instead to exercise.  *Id.*  This finding is supported by substantial evidence in the record cited by the ALJ.  Plaintiff was encouraged to attend therapy or exercise on January 16, 1997, R. 414, January 18, 1998, R. 406, August 7, 1998, R. 351 (walking 20 minutes, at least 3 times a week), and January 17, 2000, R. 1496 (continue with strengthening exercises).

The ALJ also cited a consultative examination  on January 19, 1999, by Dr. Alexander.  R. 24.  As noted by the ALJ, Dr. Alexander found Plaintiff's cervical and lumbar spine to be normal, straight leg raising was negative, gait was normal, and Plaintiff could stoop, squat, and rise.  R. 324.  The ALJ noted another examination by Dr. Alexander dated July 8, 1999.  R. 24.  Plaintiff told Dr. Alexander that he had had radiating low back and neck pain for some time.  R. 469.  Dr. Alexander found tenderness in the neck, and decreased range of motion of the spine due to muscle spasm.  R. 470.  Pain and muscle atrophy associated with the broken left leg Plaintiff had suffered in a motorcycle accident were noted.  *Id.*  X-rays of the lumbar and cervical spine were normal.  *Id.*  Dr. Alexander found Plaintiff unable to work the broken leg needed further healing.  *Id.*

        The ALJ further relied upon evidence from 2002 through 2004.  R. 25.   Dr. Reed

found on December 9, 2002, that Plaintiff had decreased range of motion in his cervical

spine, with paraspinal spasm on the right.  R. 874.  There was no atrophy of the cervical

spine or upper extremity, though Plaintiff was "in a deconditioned state."  *Id.*  He sat

comfortably during the interview.  *Id.*  Spurling's sign[12] was positive.  *Id.*  Plaintiff was

then receiving treatment at a local gym.  R. 867.  In Dr. Reed's opinion, Plaintiff had

multilevel degenerative disc disease, more severe at C6-7 and C5-6, which resulted in a

diagnosis of cervical disc disease and cervical stenosis with radiculitis, and

impingement syndrome of the left shoulder.  R. 873.  Dr. Reed thought that Plaintiff was

a candidate for anterior cervical diskectomy and interbody fusion at C5-6 and C6-7.  *Id.*

Dr. Reed sent Plaintiff to physical therapy for his shoulder problems.  *Id.*

        The ALJ also cited evidence from Dr. Reed dated April 19, 2004.  R. 25.  Dr.

Reed found that Plaintiff had normal strength in the motor examination, and Plaintiff had

"no significant clinical evidence of radiculopathy."  This finding is supported by the

record.  R. 1241.  Further, the ALJ found that on December 11, 2004, Dr. Reed

determined that Plaintiff was capable of performing a range of work between light and

medium exertional levels, with no limitations in sitting, standing, or walking.  R. 25.  This

finding is likewise supported by substantial evidence in the record.  R. 827-830.

_____

        [12] This test is used for evaluation of cervical spine radiculopathy.  The patient
laterally bends the neck to each side while maintaining a posture of cervical extension.
Pain intensified with ipsilateral bending strongly suggests a diagnosis of radiculopathy.
Pain with contralateral bending suggests musculo-ligamentous origin.  UNIVERSITY OF
FLORIDA, COLLEGE OF MEDICINE, available at:
http://www.med.ufl.edu/rheum/rheumTests.htm

Additionally, there is other evidence argued in the memorandum, but not mentioned by the ALJ, supportive of the conclusions reached.  On January 27, 1998, Dr. Kendrick recommended an anterior cervical fusion to relieve symptoms, but Plaintiff said he was not hurting and the weakness was not bothering him, and he declined surgery.  R. 500.  On this date, Plaintiff told Dr. Kendrick that he had some weakness in his right arm, which he noticed when he worked out with weights, but he told Dr. Kendrick that this had not affected his work as a carpenter and the pain was intermittent.  *Id.*  Weakness (4/5) of the right triceps was noted, and the left triceps was normal.  *Id.*  On December 10, 1998, Plaintiff's motor strength was found to be normal (5/5).  R. 383.

The Administrative Law Judge concluded that Plaintiff's allegations of disabling neck pain and hand numbness since January 1, 1997, are inconsistent with the record.  R. 29.  In addition to the findings discussed above, the ALJ determined that Plaintiff had a tendency to exaggerate.  *Id.*  The ALJ gave as an example Plaintiff's testimony that he had had three leg surgeries for his broken leg, and that he continues to have a lot of pain.  R. 29.  The ALJ found this to be an exaggeration because in December, 1999, the treating physician found that his fractured was healed, with no further complications.  This finding is supported by substantial evidence in the record.  On December 20, 1999, Dr. Goldhagen wrote that Plaintiff said he had muscle pains in his leg from doing a lot of walking, but otherwise he was doing very well and the tibia fracture on the left was healed.  R. 1497.  The ALJ further noted that Dr. Reed performed a thorough examination of Plaintiff in December, 2002, and did not note any problems with the broken leg.  R. 29.  That finding is supported by substantial evidence in the record.

Plaintiff complained to Dr. Reed on that date only of neck and shoulder pain.  R. 876.

Finally, the ALJ noted that on June 14, 2006, Plaintiff's leg was examined and his knee

had no swelling or redness, and he had good range of motion.  R. 30.  This finding is

supported by substantial evidence in the record.  R. 1531.  The finding that Plaintiff had

a tendency to exaggerate, therefore, is supported by substantial evidence in the record.

In summary, the Administrative Law Judge's determination that Plaintiff's

degenerative disc disease, and consequent neck and lower back pain, do not

significantly limit his ability to do work is supported by substantial evidence in the

record.  Further, that evidence is a sufficient basis to discount Plaintiff's pain testimony.

**Anxiety and panic disorder**

This leaves for consideration the ALJ's analysis of Plaintiff's testimony

concerning the severity of his anxiety and panic disorder.  As noted earlier, the ALJ

determined at step 3 that Plaintiff's mental impairment did not met or equal a Listed

impairment.  R. 23-24.  This section contains numerous citations to record evidence to

support the conclusion reached.

The ALJ found that Plaintiff had only mild restrictions with regard to activities of

daily living.  R. 23.  Cited for this is a psychological examination by Thomas Nunley,

Psy.D., dated September 28, 1996.  *Id.*  Dr. Nunley examined and tested Plaintiff on

that date.  Other than noting that Plaintiff reported signs of depression and anxiety,

Plaintiff's mental condition was normal.  R. 282.  Dr. Nunley found that Plaintiff was

currently unable to manage money due to substance abuse.  *Id.*  Otherwise, found that

he was able to "make acceptable work decisions."  *Id.*  He found that Plaintiff was able

to "relate to others in a work setting when he is medicated," and thought that he was

able to sustain the attention needed to do repetitive task, but is unable to
tolerate the stressors and pressures associated with day to day work
activities.  These limitations in functioning capacity appear related to
moderately severe emotional problems.

*Id*.  With regard to the activities of basic living, however, Dr. Nunley wrote:

The claimant is fully able to manage his own activity of daily living needs.
He lives with family who do not assist in ADL functions such as feeding,
dressing, and bathing.  The claimant reports that he enjoys craft work,
listening to music, watching television, talking on the phone, cooking,
sports, hunting, and fishing.

R. 282.  The ALJ's conclusion that Plaintiff had only mild restrictions of the activities of

daily living is supported by substantial evidence in the record.

The ALJ determined that Plaintiff has only mild difficulties with regard to social

functioning.  R. 23.  The ALJ noted the finding by Dr. Nunley that in 1996, Plaintiff said

that Plaintiff's "interpersonal relationships might be characterized as impaired as he has

a history of drug abuse which the claimant feels adversely effected [affected] his

relationships with others."  R. 23, citing R. 281.  The ALJ noted that despite this, on

January 19, 1999, Plaintiff reported that he had a girlfriend.  *Id*., citing R. 323.  The

record cited, however, is not substantial evidence to support a finding that in 1999,

Plaintiff's relationships with others were not impaired.  In this medical note, Plaintiff

reported that "he was hit by his girlfriend with a telephone on the Lt [left] eye."  R. 323.

The ALJ further noted that Plaintiff testified that he had a 16 year old daughter who

visited him.  R. 23.  The ALJ noted that Plaintiff's prison records did not reflect any

problems with discipline, and Plaintiff was living with his mother prior to being

incarcerated.  *Id*.  This is scant evidence to support the finding that Plaintiff has only

mild difficulties with regard to social functioning.  Nonetheless, this point was discussed in greater detail at step 5 of the analysis, which will be considered ahead.

The finding that Plaintiff has moderate difficulties with concentration, persistence, or pace made is supported by substantial evidence in the record.  R. 23.  Like the other findings, the ALJ said that this was consistent with the state agency psychological consultant's review.  *Id.*  She also said that in the 1996 examination by Dr. Nunley, it was noted that his concentration was intact, and he understood basic directions and the intent of the examination.  *Id.*, citing R. 281-282.  This is supported by substantial evidence in the record.  Dr. Nunley said that Plaintiff was oriented in person, place, time, and situation, and "[a]ttention and concentration skills were intact as the claimant could subtract serial 7's from 100 and do simple computational problems."  R. 281.  Plaintiff was also able to recall current events and common information, and could recall a series of digits and immediate items and events, both recent and remote.  R. 281-282.  Dr. Nunley said that Plaintiff "was able to understand the basic directions and intent of the examination."  R. 282.  The ALJ also cited a mental examination in the Department of Corrections on August 3, 2004.  R. 23.  Dr. Hankins reported that Plaintiff's concentration was "good" even though Plaintiff's mood was depressed and anxious.  R. 1489.  The ALJ further noted that on seven occasions, from August 30, 2004, through May 23, 2005, Elliot M. Brown, M.Ed., reported that Plaintiff's attention and concentration were good.  R. 23.  This is also supported by evidence in the record.  R. 1471, 1477, 1478, 1109, 1111, 1113, and 1116.

At step 5, the ALJ noted that Plaintiff was treated by Isabell T. Moore, LPC, at the AMC Center for Wellness.  R. 25.  On January 24, 2002, Ms. Moore said that Plaintiff

had been her patient since 1994.  R. 661.  She said that Plaintiff has severe panic

disorder.  *Id.*  Ms. Moore said that "[i]n his attempt over the years to get relief [from

panic disorder] he self-medicated with alcohol, finally becoming an alcoholic.  At this

time he has been sober for 10 months."  *Id.*  She said that when Plaintiff is sober, he

needs medications for panic attacks "so that he can function."  *Id.*  She said he also

must take medication for depression.  *Id.*  Ms. Moore concluded:  "At this time his

functioning is at an adequate level for daily living.  He needs disability benefits due to

his inability to be employed or stay employed due to his level of anxiety."  *Id.*  The ALJ

rejected this opinion, however, finding that Plaintiff's progress notes did not show "any

intensive mental health treatment," and "it appears that Ms. Moore saw the claimant

sporadically for medication recommendations."  R. 25.

        The ALJ noted that Ms. Moore had seen Plaintiff on January 16, 1997.  R. 25,

citing R. 414.  On that date, Ms. Moore said that Plaintiff exhibited depression and

anxiety "due to on going civil case," and his sleep patterns were poor again.  *Id.*  It was

at this time, noted Ms. Moore, that Plaintiff had lost his social security benefits.  *Id.*  On

February 11, 1997, Ms. Moore discussed with Plaintiff the link between anxiety and

alcoholism.  R. 412.  On November 13, 1997, Plaintiff said that his panic disorder was

then not as severe.  R. 407.  On January 19, 1998, Plaintiff told Ms. Moore that panic

attacks were recurring, and she referred him to Dr. Goodman.  R. 405.  Plaintiff did not

see Dr. Goodman, however, as the last medical note from him is dated June 2, 1997.

Doc. 118, p. 5, citing R. 358.

        The ALJ noted that Plaintiff did not see Ms. Moore again until 18 months later, on

August 10, 1999, and there are no findings on that date as to Plaintiff's mental condition.

R. 26, 671.  On September 14, 1999, Plaintiff's major problem was that he had a

pending criminal charge, need $1,300 for a bond, and planned to appeal his conviction.

R. 665.  His progress was thought to be good.  *Id.*  The next month, October 26, 1999,

Ms. Moore reported that Plaintiff was drinking again and his anxiety was back.  R. 664.

He said he was worried and had "so much stress."  *Id.*  Progress then was thought to be

fair.  *Id.*

Plaintiff did not see Ms. Moore again for another two years, four months.  R. 26,

662.  On January 10, 2002, Plaintiff was seen by Ms. Moore and she said his presenting

problem was severe anxiety and panic disorders.  *Id.*  She recommended dietary

changes and continued prescription medications.  *Id.*

Plaintiff was then seen by Nadeen Bonica, A.R.N.P., commencing a number of

months later, inn September, 2002, and running through 2003.  R. 26.  The ALJ noted

that on 13 occasions in about an 18 month period, Nurse Practitioner Bonica found that

Plaintiff's level of anxiety was within normal limits.  This finding is supported by the

record as cited by the ALJ.  R. 885, 889, 891, 893, 895, 897, 899, 985, 986, 1003, 1004,

1006, 1008.  Not all of the notations by Nurse Practitioner Bonica were "within normal

limits."  Anxiety was noted by Nurse Practitioner Bonica to be moderate on September

4, 2002, R. 992, within normal limits on October 2 and 29, 2002, R. 989, 990, high on

November 8, 2002 and November 21, 2002, R. 978 and 988, and within normal limits

again December 23, 2002.  R. 1008.  This is evidence that Nurse Practitioner Bonica

exercised her professional judgment as she filled out this form.

The ALJ next noted that Plaintiff was seen by Elliott M. Brown, Psychologist

Specialist, on August 30, 2004.  R. 26.  Brown reported that Plaintiff suffered from

pathological anxiety, had mild to moderate signs of mental or emotional impairment, but was now stabilized on medications.  R. 1116.  His attention and concentration were good.  *Id.*  On December 20, 2004, Brown said that Plaintiff had no signs of significant mental or emotional impairment and was now stabilized on medication.  R. 1473. Plaintiff said that his anxiety and depression were good.  *Id.*  On February 21, 2005, Brown thought that Plaintiff again had mild to moderate mental or emotional impairment. R. 1471.  Plaintiff said that he was then not taking his medications, needed medications, and his depression and anxiety were getting worse.  *Id.*

On August 19, 1999, Ms. Moore prepared a mental residual functional capacity assessment for Plaintiff.  R. 547-547A.  She said that she thought that Plaintiff was severely impaired in his ability to respond to customary work pressures.  R. 547.  She thought that Plaintiff was moderately severely impaired in his ability to relate to other people, understand and carry out instructions, respond appropriately to supervision, work with co-workers, perform complex tasks, and perform varied tasks.  R. 547-547A. An impairment of moderate severity was defined on the form as one that "seriously affects ability to function."  R. 547A.

The ALJ said that she gave minimal weight to Ms. Moore's conclusions "as they are unsupported by rationale and are not corroborated by treatment records."  R. 26. The ALJ said that she discussed Ms. Moore's records and "was unable to find any documented observations or clinical abnormalities which corroborate Ms. Moore's conclusions."  *Id.*  The ALJ reasoned that if Ms. Moore was correct, one "would expect to see evidence of more intensive and frequent mental health treating sources [who would have rendered] similar conclusions."  *Id.*  The ALJ noted, to the contrary, that

other treating sources (Nurse Practitioner Bonica and Mr. Brown at the Department of Corrections) have noted that Plaintiff's anxiety is controlled with medication.  *Id.* Further, as the ALJ had previously noted in discussing the evidence, Plaintiff was able to return to work in 2000.  R. 26-27.  The ALJ   also noted that Mr. Brown assigned a GAF of 70[13] both in August, 2005, and August, 2006.  R. 27.  This is supported by evidence in the record.  R. 1484 (August 8, 2005) and 1483 (August 24, 2006).  This is indicative of a relatively unimpaired level of functioning.  Plaintiff notes in his memorandum that during the period from August 12, 2002, through March 25, 2005, he was assigned GAF scores from 58-65, suggestive of moderate to mild symptoms of social or occupational functioning.  Doc. 118, p. 12.  The ALJ also said that she gave little weight to Ms. Moore's opinion because her opinion was inconsistent with other findings in her records.  R. 27.  She noted, and the record reflects, that Ms. Moore contemporaneously said that Plaintiff's medication allowed him "to function daily, sleep at night[,] interact with his family, [and] take care of personal things."  R. 547A.  Ms. Moore said that without medication, Plaintiff is not able to function in any normal manner.  *Id.*

The ALJ further noted that on January 24, 2002, Ms. Moore wrote:

At this time his functioning is at an adequate level for daily living.  He needs disability benefits due to his inability to be employed or stay employed due to his level of anxiety.

---

[13] A GAF score of 61-70 indicates: "Some mild symptoms ( e.g., depressed mood and mild insomnia ) OR some difficulty in social occupational, or school functioning ( e.g., occasional truancy or theft within the household ), but generally functioning pretty well, has some meaningful interpersonal relationships."  See http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

R. 27, citing R. 661.  The ALJ deemed the statement concerning a need for disability

benefits to be not a medical opinion, but a legal opinion, and gave it little weight.  R. 27.

Finally, the ALJ noted that the state agency tried to develop the medical record

with respect to Plaintiff's limitations.  R. 27.  She observed that Plaintiff refused to

cooperate.  *Id.*  This finding is supported by substantial evidence in the record.  On July

14, 1998, six years before Plaintiff became incarcerated, Plaintiff reported to Judith

Rogers, Ph.D., a licensed psychologist, for a disability evaluation.  R. 305.  He failed to

bring any records, and he refused to be "a witness" because he was "under a gag order

at the moment."  *Id.*  He did not bring any proof of his inability to be interviewed, though

as will be seen, his reticence seems to have been related to a lawsuit he was then

pursuing against the City of Wetumpka, Florida.  *Id.*  Dr. Rogers noted that Plaintiff had

a history of seven DUI arrests and a long history of abuse of marijuana and alcohol.  *Id.*

She said that, as reported in the "expert witness summary" given to her, he had been

through at least six inpatient treatment facilities.  R. 306.  Dr. Rogers felt that Plaintiff

was trying to manipulate the disability evaluation process "to suit his own convenience."

*Id.*  Plaintiff declined to take standard psychological tests and to participate in any sort

of psychological evaluation.  *Id.*

The "expert witness summary" that Plaintiff gave to Dr. Rogers is by Karl

Kirkland, Ph.D., also a licensed psychologist.  R. 308-309.  Dr. Kirkland said that he

took a comprehensive history from Plaintiff and administered psychological tests.  R.

308.  He concluded that Plaintiff "has become fixated on the effects of the physical

violence he allegedly suffered at the time of his arrest in the City of Wetumpka."  R. 309.

Dr. Kirkland said that the test results "reveal a pattern of chronic and long-standing

characterological personality factors in this individual."  *Id.*  Dr. Kirkland said that Plaintiff

was "inappropriately blaming a long list of problems" on the alleged excessive use of

force during the arrest.  *Id.*  He said that Plaintiff's "profile is characterized by

exaggerated emotionality, psychological naiveté, hypochondriasis, and pervasive false

attribution of blame."  *Id.*  Dr. Kirkland concluded:  "It is a therapeutic disservice to this

patient to assist in any process which continues to foster the false belief that all his

current problems are due to the above alleged exposure to violence in this case."  *Id.*

After this rather thorough review of the evidence of the potentially disabling

effects of Plaintiff's experience of panic and anxiety, the ALJ concluded that "the record

fails to establish any work-related limitations as a result of mental impairments which

would preclude the claimant from performing unskilled work."  R. 30.  She concluded

that Plaintiff's testimony, that he could not work due to inability to concentrate and

maintain attendance, was not credible to the degree alleged.  *Id.*  She noted that

Plaintiff demonstrated no difficulty comprehending questions during the hearing, or in

explaining why he thought he was disabled.  *Id.*  That evidence has been discussed

above and is substantial evidence in the record to support the ALJ's conclusion that

Plaintiff's testimony was not credible.  As a consequence, the ALJ's determination that

Plaintiff's experience of anxiety and panic disorder do not impose significant limitations

upon his ability to do light work is supported by substantial evidence in the record.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge correctly followed the law and are based upon substantial evidence in the record.  The determination that Plaintiff was capable of doing light work is supported by substantial evidence in the record.  As a consequence, the ALJ properly relied upon the "grids." Plaintiff's age, prior work skills, and ability to do a full range of light work compelled the conclusion that Plaintiff had not show disability.  The decision of the Commissioner should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on February 9, 2009.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**